2015 IL App (1st) 132837

SECOND DIVISION
October 20, 2015

No. 1-13-2837

| | | |
|---|---|---|
| AREF SENNO, M.D., | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County |
| | ) | |
| v. | ) | |
| | ) | No. 11 CH 23545 |
| THE DEPARTMENT OF HEALTHCARE | ) | |
| AND FAMILY SERVICES, and JULIE HAMOS, | ) | |
| | ) | Honorable |
| | ) | David B. Atkins, |
| | ) | Judge Presiding. |
| | ) | |
| Defendants-Appellees. | ) | |

PRESIDING JUSTICE PIERCE delivered the judgment of the court, with opinion.
Justices Simon and Hyman concurred in the judgment and opinion.

## OPINION

¶ 1    Plaintiff Aref Senno, M.D., appeals from a decision of the Illinois Department of

Healthcare and Family Services (Department) terminating his participation in a medical

assistance program administered by the Illinois' Medical Assistance Program (Program) where

participating physicians receive reimbursement for treating Medicaid recipients. On appeal, Dr.

Senno argues: (1) the Administrative Law Judge (ALJ) improperly relied on Dr. Fatoki's

testimony; (2) the ALJ's findings were against the manifest weight of the evidence; and (3) the

ALJ failed to apply the correct standard in determining whether Dr. Senno had provided grossly

inferior care. For the following reasons, we affirm the decision of the Department.

¶ 2                                    I.  BACKGROUND

¶ 3      The Department requires physicians who participate in the medical assistance program to maintain sufficient records "to fully and accurately document the nature, scope, details, and receipt of the health care provided." 305 ILCS 5/5-5 (West 2000).  The Department may review the participating physician's medical records in order to monitor the quality of care given to Medicaid recipients. *Id*.

¶ 4      In 2000, Dr.  Senno, a physician with forty-plus years of experience and a long-time provider in the Program, was asked by the Department to produce medical charts for 15 Medicaid patients.  Although Dr. Senno treated many of these patients for a long period of time, the Department specifically requested records spanning the period of April 1, 1998 to June 30, 1999. The Department's Medical Quality Review Committee (Committee), which included the Department's primary consultant Dr. Adeyemi Fatoki, and two other physicians, reviewed the medical records and met with Dr. Senno in September 2002 to discuss his medical practices. On April 13, 2004, based on the Committee's findings, the Department notified Dr. Senno of its intent to terminate him from the Program for violating the Illinois Public Aid Code (Code) (305 ILCS 5/1 *et seq.* (West 2002)), and the Illinois Administrative Code (89 Ill. Adm. Code § 140.16(a)(7), amended 28 Ill. Red. 4958 (eff. Mar. 3, 2004)) which states a vendor may be terminated from participating in the Program for furnishing services that are (1) in excess of the patient's needs, (2) harmful to the patient, or (3) of grossly inferior quality; all such determinations shall be based on competent medical judgment and evaluation.

¶ 5      The Department charged Dr. Senno with seven counts of providing care that was of

grossly inferior quality, in excess of needs, and placed patients at risk of harm. The seven counts included Dr. Senno's alleged failure to: (count I) adequately treat a patient with congestive heart failure; (count II) adequately manage a patient with diabetes mellitus; (count III) prescribe antibiotics without any clinical indication; (count IV) properly evaluate a patient with urethral discharge; (count V) properly prescribe medications; (count VI) address abnormal lab results and; (count VII) evaluate a patient with a possible ulcer while the patient was taking nonsteroidal drugs.  Dr. Senno requested a hearing to review the Department's decision. A hearing before an ALJ commenced in May 2004 with two witnesses: Dr. Fatoki, a member of the reviewing Committee, who testified as an expert for the Department without objection, and Dr. Senno, who testified on his own behalf. This appeal concerns only count III, which alleged Dr. Senno prescribed antibiotics to multiple patients on numerous occasions without clinical indication, and count IV, which alleged Dr. Senno did not properly evaluate a patient for a sexually transmitted disease. This court will discuss only those facts relevant to this appeal.

¶ 6                              A.  Count III

¶ 7    Count III alleged that Dr. Senno prescribed antibiotics without clinical indication where antibiotics should only be used after a complete physical examination with laboratory results, where appropriate, that document that a bacterial infection process is present in a patient that can only be addressed by an antibiotic.

¶ 8    As an expert witness for the Department, Dr. Fatoki testified the proper standard of care for prescribing antibiotics includes documenting enough information to justify a presumptive or definitive diagnosis of a bacterial infection, or documenting enough circumstances to call for the drug's prophylactic use against the development of a bacterial infection or other serious

condition. He explained a presumptive diagnosis is based on the patient's medical history, patient complaints, and on the physician's objective findings from a physical exam and a definitive diagnosis is based on diagnostic test results. Dr. Fatoki explained the standard of care for prescribing antibiotics includes documentation in the medical record of the patient's medical history, complaints, physical exam findings, any test results, the diagnosis, and the treatment plan. Dr. Fatoki testified the physician must document enough information in the medical record to justify diagnosing the patient with a bacterial infection or using an antibiotic for a prophylactic purpose.

¶ 9    Dr. Fatoki reviewed the medical records at issue and evaluated them against Dr. Senno's medical experience and background. The medical records of eight patients, representing 18 visits to Dr. Senno, were introduced into evidence. Dr. Fatoki explained these medical records showed Dr. Senno documented the patient's complaints, his physical exam findings, and an antibiotic prescription on most visits. Dr. Fatoki testified there was no medical history or diagnosis documented in any of these records for any of the patients. Dr. Fatoki opined that Dr. Senno's documentation of symptoms and physical exam findings in the patients' medical records could indicate either a bacterial or a viral infection and were not enough to justify an antibiotic prescription. Attached to the medical records were the billing statements for the visits. Dr. Fatoki testified Dr. Senno documented the diagnosis of 12 of these visits in his billing statements as "coughing," "congestion," or "sore throat," which Dr. Fatoki explained are symptoms and not bacterial infections warranting antibiotics. Other patient billing statements for the remaining doctor's visits contained the diagnosis of "cholelithiasis (gall bladder stones)," "renal stones," "cystitis (bacterial bladder inflammation)," "otitis media (ear infection)"and "renal infection,"

yet Dr. Fatoki testified Dr. Senno's medical records showed no clinical indication for these diagnoses and no justification for the antibiotic treatment Dr. Senno prescribed.

¶ 10    Dr. Fatoki opined that Dr. Senno overall relied on too little information to diagnose these patients with bacterial infections because what is documented could also indicate a viral infection, which is unresponsive to antibiotics. Dr. Fatoki testified Dr. Senno did not delve into his patient's complaints, signs, and symptoms deep enough to determine the findings indicated a bacterial infection and did not document any information that would support a prophylactic purpose for the antibiotic.

¶ 11    Based on the lack of documentation in the medical records, Dr. Fatoki testified Dr. Senno provided grossly inferior care to these patients. Grossly inferior care, he explained, was care that was below the minimum standard of care necessary to treat a patient's medical problem. Dr. Fatoki also testified these antibiotic prescriptions were in excess of needs and created a risk of harm to these patients. A risk of harm presents itself when the potential adverse effect of the treatment outweighs the benefit of the treatment. Unnecessary antibiotic use puts patients at risk of developing a resistance to bacteria, explained Dr. Fatoki, and exposes patients to possible allergic reaction to the antibiotic. Dr. Fatoki did testify that an antibiotic has to be unnecessarily overused many times before resistance in a patient could develop. Care in excess of needs is care that is not necessary for the treatment of the patient, he explained, and Dr. Senno exceeded necessary treatment by prescribing antibiotics without any documentation in the medical records to justify a bacterial infection or prophylactic purpose for such treatment.

¶ 12    Dr. Senno rebutted Dr. Fatoki's testimony asserting he met the standard of care for these patients because he relied on his history of treating these patients over a long period of time and

his physical exam findings. Dr. Senno testified that with appropriate history, information and physical exam findings, a physician can properly diagnose a bacterial infection and prescribe an antibiotic. Dr. Senno testified he made findings he did not record in the medical records as he focused on the patient rather than documenting everything. However, based on his experience and history with the patient he was able to presumptively diagnose many of these patients with bacterial infections or determine their need for prophylactic antibiotic prescription.

¶ 13    When questioned about the medical records at issue, Dr. Senno bolstered what was actually documented with testimony about the patient's medical history and past treatments that occurred prior to the subset of records reviewed by the Department. He also recollected there were additional symptoms for each of these patients that contributed to his diagnosis, even though he did not document them in the patients' medical records.

¶ 14    For example, documented in one patient's medical record is a complaint of coughing and physical exam findings of a clear chest, a normal heart rate, and a soft abdomen. During his testimony, Dr. Senno added the patient was coughing up blood and that he "checked everything" and could not find a problem in the patient's lungs or abdomen. He testified that based on his experience, the blood could indicate an infection in either the lungs or gastrointestinal system and an antibiotic prescription was necessary to prevent the bleeding and admission to the hospital. When questioned about other medical records at issue, Dr. Senno recollected individual patient information such as being a heavy smoker, past surgeries, place of employment, renal failure, cardiac problems, surgical complications, and past illnesses to justify his prescribing antibiotics to the patients.  Dr. Senno testified that none of this information was recorded in the medical records at issue and that most of these diagnoses were presumptive of a bacterial

infection. Dr. Senno recollected there was one occasion where he definitively diagnosed a patient with a bacterial infection of strep throat based on the patient's complaint of coughing and Dr. Senno's observation of redness in the patient's throat. Dr. Senno made no documentation of the redness of the throat in the patient's medical records.

¶ 15    Regarding his diagnoses of "coughing," "congestion," and "sore throat" on his billing statements, Dr. Senno acknowledged these were symptoms and not necessarily a sign of bacterial infection but he considered these symptoms in conjunction with the individual patient's history which may include age, past surgeries, and past health issues to diagnose these patients with an upper respiratory infection or to determine an antibiotic is necessary for prophylactic purposes.

¶ 16    For the patient with cholelithiasis, the medical record showed the patient had tenderness over the "right upper quadrant." Dr. Senno testified he concluded the patient had gall bladder stones and ordered an ultrasound of his gallbladder, although this is not noted in the medical records. Dr. Senno added that as soon as symptoms of cholelithiasis appear, which is localized tenderness under the ribs, an antibiotic is prescribed as a prophylactic for an infection. For the patient diagnosed with cystitis, there were no physical exam findings in the medical record. Dr. Senno testified he based his diagnosis on the patient's medical history, which included gall bladder surgery. Similarly, Dr. Senno based his diagnosis of renal infection on the patient's complaints, which are recorded in the medical record, and the patient's past medical history of bladder and kidney infections and past surgery, which were not in the medical record. As for the patient with otitis media, Dr. Senno testified that he based his diagnosis on the patient's complaint of a sore throat and the patient's age and history.

¶ 17    Dr. Senno countered Dr. Fatoki's testimony that the antibiotic therapy Dr. Senno

prescribed was appropriate and not grossly inferior quality of care because the antibiotics were appropriate and he never prescribed more than was needed to appropriately treat the patients. Dr. Senno testified he did not place any of the patients at risk of harm for developing a resistance to the antibiotic or the occurrence of an allergic reaction. He explained it takes many months of antibiotic use for resistance to develop and used Burke A. Cunha, M.D., Antibiotic Essentials (2004) to support this claim. Dr. Senno testified he never prescribed more than ten days worth of medicine at a time, which is also the reason he did not record the quantity prescribed in the medical records.

¶ 18                                    B.  Count IV

¶ 19     Count IV alleges Dr. Senno failed to properly evaluate one patient with urethral discharge. The medical records for this patient show a complaint of penile discharge and a prescription for an antibiotic commonly used to treat chlamydia. Dr. Fatoki testified Dr. Senno provided grossly inferior care to this patient because the medical record lacks any medical history, physical exam findings, diagnosis, or diagnostic testing. Without diagnostic testing, Dr. Fatoki opined, it can be difficult to diagnose what exactly is causing the discharge and the mere color is not enough as clear discharge may also indicate gonorrhea. Dr. Fatoki added that it is inappropriate to treat someone for a sexually transmitted disease without doing diagnostic testing.

¶ 20     Dr. Fatoki testified Dr. Senno provided grossly inferior care to this patient because he did not document the patient's history, physical exam findings, or test results. Dr. Fatoki elaborated that this lack of care also created the possibility that the underlying cause of the discharge would not be treated which exposed the patient to greater risk of harm.

¶ 21    Dr. Senno countered Dr. Fatoki's testimony with the explanation that he performed a comprehensive exam of the patient and found a small, clear discharge from the patient's penis. Dr. Senno only noted the existence of the discharge and not the color in the medical record. He explained, however, he remembered the patient's discharge "very well" and that his diagnosis of "nonspecific urethritis" in the billing records meant the discharge was clear. He explained at the time of the patient's visit in 1999 there were two different diagnoses for patients with penile discharge: chlamydia or gonorrhea. Gonorrhea presents with a yellow discharge and chlamydia with clear discharge. Dr. Senno testified the standard of care at this time was to treat the patient with a chlamydia-specific antibiotic and not conduct any diagnostic testing. Dr. Senno asserts the care for this patient was not grossly inferior and did not place the patient at greater risk or harm.

¶ 22                                    C.  ALJ's Decision

¶ 23    In April 2009, after considering the testimony and medical records, the ALJ concluded the Department had proven counts III and IV by a preponderance of the evidence that Dr. Senno provided grossly inferior care to his patients, exposed them to risk of harm, and provided excess care and thus, recommended his termination from the Program.

¶ 24    Concerning count III, the ALJ found Dr. Senno had provided grossly inferior care, exposed his patients to risk of harm, and provided excessive care by failing to document sufficient physical exam findings that indicated the presence of a condition that necessitated an antibiotic. The ALJ found Dr. Fatoki's testimony and opinion more credible than Dr. Senno's when describing the appropriate standard of care for prescribing antibiotics. The ALJ also found Dr. Senno unpersuasive in his recollections of his treatment and findings of the patients at issue, particularly because there were no documented physical exam findings to corroborate his

testimony. Concerning count IV, the ALJ determined the Department proved by a preponderance of the evidence that Dr. Senno provided grossly inferior care to his patient but did not prove by the same measure that he placed his patient at risk of harm. The ALJ found Dr. Senno's failure to elicit a history of the patient's complaint, to perform a physical examination, and to provide a diagnostic test was grossly inferior care. The ALJ stated the Department did not prove that this patient was at risk of harm, mainly because no evidence was provided to show what harm the patient was at risk of suffering. In July 2009, the Department adopted the ALJ's report and terminated Dr. Senno from the Program.

¶ 25                     D.  Circuit Court Proceedings

¶ 26    Dr. Senno requested review of his termination to the circuit court of Cook County. In November 2009, the court reversed and remanded to the Department to clarify and reapply the "grossly inferior care" standard as it determined the Department improperly relied on Dr. Fatoki's definition of such care.

¶ 27                     E.  ALJ's Decision on Remand

¶ 28    In February 2011, without any additional hearing or other proceedings, the ALJ reevaluated the testimony and evidence from the April 2009 hearing under a new definition of grossly inferior care. To determine the proper definition, the ALJ dissected the term "grossly inferior care" using The American Heritage Dictionary of the English Language (Houghton Mifflin Company 3d ed. 1992). The ALJ determined that "gross" meant flagrant, and "inferior" meant low, and concluded the definition of "grossly inferior care" meant flagrantly bad care. The ALJ then removed any direct or implied opinions of Dr. Senno's quality of care made by Dr. Fatoki or Dr. Senno from its reevaluation of the 1999 hearing. Ultimately, the ALJ determined

Dr. Senno provided flagrantly bad care when he did not document sufficient information to warrant his diagnoses or his antibiotic prescriptions. For count III, the ALJ again found Dr. Senno's testimony unpersuasive and incredulous and determined the Department had proven by a preponderance of the evidence that Dr. Senno practiced excessive care, put these patients at risk of harm, and provided grossly inferior care. The ALJ found the entries in the medical records were indicative of the type of care Dr. Senno provided to his patients and his testimony bolstering these records was not credible and sometimes contradictory. The ALJ concluded there is no evidence in any of the medical records that would support a clinical indication for antibiotic therapy.

¶ 29    As for count IV, the ALJ again found the Department proved by a preponderance of the evidence that Dr. Senno provided grossly inferior care to the patient at issue because he did not obtain any patient history relating to the complaint, performed no physical examination, and provided no diagnostic testing to evaluate the complaint. The ALJ found Dr. Fatoki's testimony credible and corroborated by the medical record in evidence, and found Dr. Senno's testimony unpersuasive as it was based entirely on his recollection. The ALJ issued a revised report recommending Dr. Senno's termination from the Program and the Department again adopted the ALJ's recommendation.

¶ 30                    F.  Second Circuit Court Proceedings

¶ 31    Dr. Senno requested the circuit court review the Department's decision, stating the wrong definition of grossly inferior care was again applied. In August 2013, the circuit court affirmed the Department's decision to terminate Dr. Senno from the Program. On September 3, 2013, Dr. Senno timely filed notice of this appeal.

¶ 32                                    II. ANALYSIS

¶ 33    Judicial review pursuant to Administrative Review Law (735 ILCS 5/3-101 (West 2010))

requires this court to review all questions of law and fact presented by the record in relation to

the administrative agency's decision and not the decision of the ALJ or the circuit court.

*Lindemulder v. Board of Trustees of the Naperville Firefighters' Pension Fund*, 408 Ill. App. 3d

494, 500 (2011). The standard of review this court applies depends on the question presented.

*Comprehensive Community Solutions, Inc. v. Rockford School District No. 205*, 216 Ill. 2d 455

(2005).

¶ 34    "When an issue of pure law is raised, we review *de novo*."  *Parikh v. Division of*

*Professional Regulation of the Department of Financial & Professional Regulation*, 2014 IL

App (1st) 123319, ¶ 19 (citing *Village Discount Outlet v. Department of Employment Security*,

384 Ill. App. 3d 522, 525 (2008)). "When the issue raised is one of fact, we will only ascertain

whether such findings of fact are against the manifest weight of the evidence." *Id*. (citing

*Provena Covenant Medical Center v. Department of Revenue*, 236 Ill. 2d 368, 386-87 (2010)).

Lastly, "[a] mixed question of law and fact is reviewed under the clearly erroneous standard."

*Id.* (citing *Heabler v. Illinois Department of Financial & Professional Regulation*, 2013 IL App

(1st) 111968, ¶ 17). A mixed question of law and fact is one " 'in which the historical facts are

admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy

the statutory standard.' " *Id.* (quoting *Pullman-Standard v. Swint*, 456 U.S. 273, 289 n.19

(1982)).

¶ 35    Dr. Senno first argues that the ALJ, on remand from the circuit court, failed to apply the

correct standard in determining whether Dr. Senno had provided a grossly inferior quality of

care. As previously discussed, the circuit court remanded this cause to the Department to clarify and reapply the "grossly inferior care" standard as it determined the Department improperly relied on Dr. Fatoki's definition of such care.

¶ 36    On remand, the ALJ noted that the Code does not define the phrase "grossly inferior" care and relied on the dictionary to define "gross" and "inferior." Using the definitions found therein, the ALJ determined that "grossly inferior" care was "flagrantly bad." The ALJ then determined that a physician provides flagrantly bad care when he does not obtain "sufficient information to warrant his or her diagnosis and the therapy that is provided." The ALJ noted that the circuit court opined that "grossly inferior" care meant "wanton disregard for the generally accepted standard of care" and that Dr. Senno's conduct was "grossly inferior" under either definition.

¶ 37    Whether the ALJ applied an erroneous definition of "grossly inferior" is an issue of statutory construction and a question of law, which is reviewed *de novo*. *Andrews v. Kowa Printing Corp.,* 217 Ill. 2d 101, 106 (2005). The primary rule of statutory construction is to ascertain and give effect to the intent of the legislature, *MD Electrical Contractors, Inc. v. Abrams*, 369 Ill. App. 3d 309, 312 (2006). Typically *de novo* review is "independent and not deferential," *(*internal quotations marks omitted) *(Goodman v. Ward*, 241 Ill. 2d 398, 406 (2011)), yet when concerning statutory construction, the reviewing court should give the interpretation of the agency charged with the statute's administration "substantial weight and deference." *Provena Covenant Medical Center v. Department of Revenue*, 236 Ill. 2d 368, 387 n. 9 (2010). This is in recognition of the agency's role as an informed source of the legislature's intent, in addition to the agency's expertise and experience. Ultimately, the administrative

agency's interpretation is not binding and this court may reject it if it is unreasonable or erroneous. *Shields v. Judges' Retirement System of Illinois*, 204 Ill. 2d 488, 492 (2003).

¶ 38    Illinois law states,

> "The Illinois Department may deny, suspend or terminate the eligibility of any person *** to participate as a vendor of goods or services to recipients under the medical assistance program *** if after reasonable notice and opportunity for a hearing the Illinois Department finds:
>
> * * *
>
> (e) Such vendor has furnished goods or services to a recipient which are (1) in excess of his or her needs, (2) harmful to the recipient, or (3) of grossly inferior quality, all of such determinations to be based upon competent medical judgment and evaluations[.]" 305 ILCS 5/12-4.25(A)(e) (West 2006).

There is no definitionn of the phrase "grossly inferior quality" in the statute itself.

¶ 39     Dr. Senno argues the ALJ's interpretation of "grossly inferior quality" is improper and the ALJ should have applied the circuit court's definition. According to the statute, the ALJ conducting the hearing and investigation is a qualified representative of the Department. 305 ILCS 5/12-4.9 (West 2002). An interpretation by the agency charged with the statute's administration is given "substantial weight and deference." Here, the ALJ's definition of "grossly inferior" is given deference. *Provena Covenant Medical Center*, 236 Ill. 2d at 387 n. 9. Furthermore, the definition formulated by the Department is not unreasonable and has been used by this court when defining "gross" conduct in other comparable statutes. See *e.g., Maun v. Department  of Professional Regulation*, 299 Ill. App. 3d 388, 397 (1998) (defining the term

14

"gross" as "[g]laringly obvious; flagrant" (internal quotation marks omitted) when defining gross conduct under the Medical Practice Act of 1987 (225 ILCS 60/22(A)(25)) (West 1992)); *Gordon v. Department of Registration & Education*, 130 Ill. App. 2d 435, 438-39 (1970) (defining the term "gross" as "flagrant" when defining gross immorality in the Illinois Pharmacy Practice Act, Ill. Rev. Stat. 1963, ch. 91, §55.7(f)). This court finds the Department properly defined the phrase "grossly inferior quality" as "flagrantly bad" when weighing Dr. Senno's care to the patients at issue in counts III and IV.

¶ 40    Dr. Senno argues the Department's factual findings were against the manifest weight of the evidence. Findings of fact and credibility determinations on review are held to be *prima facie* true and correct and should not be overturned unless they are against the manifest weight of the evidence. *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 210 (2008). An administrative agency's factual determinations are against the manifest weight of the evidence if the opposite conclusion is clearly evident. *Id.* It is not this court's function to reevaluate witness credibility or resolve conflicting evidence. *Morgan v. Department of Financial & Professional Regulation*, 374 Ill. App. 3d 275, 288-89 (2007). If these issues are merely ones of conflicting testimony or credibility of witnesses, the determinations of the agency should be upheld. *Keen v. Police Board of the City of Chicago*, 73 Ill. App. 3d 65 (1979).

¶ 41    Because this court cannot reweigh the evidence or reassess the credibility of the witnesses on review, our sole inquiry is whether the Department's decision to terminate Dr. Senno is factually supported by clear and convincing evidence that Dr. Senno provided the patients at issue with grossly inferior care, exposed them to risk of harm, or provided care in excess of their needs in violation of section 12-4.25(A)(e) of the Code. 305 ILCS 5/12-

4.25(A)(e) (West 2002). Contrary to Dr. Senno's argument here, this is a mixed question of law and fact and therefore the clearly erroneous standard, rather than the manifest weight standard, applies.

¶ 42    The clearly erroneous standard of review lies between the manifest weight of the evidence standard and the *de novo* standard, and lends some deference to the agency's decision. *Lombard Public Facilities Corp. v. Department of Revenue*, 378 Ill. App. 3d 921 (2008). The Board's decision will be deemed clearly erroneous only where, upon review of the entire record, we are "left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 393 (2001).

¶ 43    What was and was not documented in Dr. Senno's medical records provides enough evidence for this court to conclude that the Department's decision that Dr. Senno provided grossly inferior care was not clearly erroneous.  With respect to count III, Dr. Fatoki testified the documented physical exam findings in the medical records provided no clinical indication that a bacterial infection was present in any of the patients at issue.  Dr. Fatoki opined that the physical examination findings that were recorded by Dr. Senno could indicate a bacterial infection, but it could also indicate a viral infection for which an antibiotic is not warranted. Dr. Fatoki stated that to determine if a bacterial infection was present, more information is needed to support antibiotic therapy.  Dr. Senno countered for all the patients at issue, he did obtain all the necessary information; he just did not record his findings or the patient history in the medical records reviewed by the Department. Dr. Fatoki testified, and the medical records admitted into evidence corroborated his testimony, that Dr. Senno's medical records lacked physical exam

findings that would support a therapeutic purpose and benefit for the antibiotic prescribed. The records also lacked any determination that the antibiotics prescribed were indicated for a prophylactic purpose. The Department considered the medical records as relevant and probative evidence of the type of care provided by Dr. Senno. Based on the testimony of both Dr. Fatoki and Dr. Senno and the medical records in evidence, it is clear that Dr. Senno provided grossly inferior care and therefore the Department's decision to terminate him from the Program was not clearly erroneous.

¶ 44    Concerning count IV, Dr. Fatoki's testimony outlined the standard of care for evaluating a patient's complaint of penile discharge is to obtain patient history concerning the complaint, conduct a physical examination pertaining to that complaint, and ordering any diagnostic testing, particularly an STD culture test, to evaluate the complaint. The medical record for the patient at issue showed no patient history pertaining to the complaint, no physical exam, and no diagnostic testing. Dr. Senno testified the diagnosis in his billing statement of "nonspecific urethritis" indicated he did conduct a physical exam and found clear discharge, which indicated diagnostic testing was not necessary to support his choice of antibiotic therapy. The ALJ, relying on the medial records, found Dr. Senno's assertions had no probative value because there were no physical exam findings in the medical record. Thus, the Department's decision that Dr. Senno provided grossly inferior care to this patient was not clearly erroneous.

¶ 45    In a related argument, Dr. Senno argues that the ALJ erred when it improperly relied on Dr. Fatoki's testimony as substantive evidence of the care provided by Dr. Senno. Dr. Senno contends that this was improper where Dr. Fatoki's was merely an expert witness who lacked the personal knowledge required of a fact witness. Dr. Senno asserts that the Department relying on

the "credible testimony of Dr. Fatoki" indicated it relied on that testimony to determine how Dr. Senno treated his patients during patient visits when he simply should have reviewed the patient's medical records and offered expert testimony on the standard of care and whether Dr. Senno deviated from it.

¶ 46    We reject Dr. Senno's argument on this issue.  The ALJ's decision on remand from the circuit court, which was adopted by the Department, clearly stated in its finding that it was excluding "any direct and implied opinions by Dr. Fatoki and [Dr. Senno] regarding the quality of care provided by [Dr. Senno.]"  In its reevaluation of the evidence, the ALJ merely relied on Dr. Fatoki's expert testimony to determine the accepted standard of care and weighed this against Dr. Senno's documented care in his medical records to determine whether Dr. Senno deviated from that standard.

¶ 47                             CONCLUSION

¶ 48    For the foregoing reason, we affirm the decision of the Department.

¶ 49    Affirmed.