2023 IL App (1st) 210607-U

No. 1-21-0607

Order filed June 8, 2023

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| DISABILITY SERVICES OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 19 CH 9305 |
| | ) | |
| THE DEPARTMENT OF HUMAN SERVICES; and | ) | |
| GRACE B. HOU, Secretary of Human Services, | ) | Honorable |
| | ) | Allen Price Walker, |
| Defendants-Appellees. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE LAMPKIN delivered the judgment of the court.
Justices Rochford and Martin concurred in the judgment.

**ORDER**

¶ 1     *Held*: The department's final administrative decision to revoke the residency license and developmental training certificate of a nonprofit corporation providing services for the developmentally disabled is affirmed because (1) the relevant statute and regulations were not unconstitutionally vague, (2) the department did not exceed its statutory authority and followed its policies and procedures, and (3) the department's factual findings were not against the manifest weight of the evidence and its ultimate determination was not clearly erroneous.

¶ 2      The secretary of the Department of Human Services (Department) adopted the findings and report of the administrative law judge (ALJ) and revoked the license and denied the certificate of plaintiff, Disability Services of Illinois (DSI), a nonprofit corporation that provided housing and training services for developmentally disabled adults. DSI sought administrative review, and the circuit court affirmed the Department's decision.

¶ 3      On appeal, DSI argues the Department's decision should be reversed because (1) the Department failed to establish guidelines for exercising discretion in revoking licenses and certifications based on the imminent risk to participants, (2) the Department exceeded its statutory authority by failing to follow its rules and regulations, (3) the Department did not prove the alleged violations and the final order was against the manifest weight of the evidence and clearly erroneous, and (4) the circuit court erred by denying DSI's motion to reconsider based on newly discovered evidence.

¶ 4      For the reasons that follow, we affirm the judgment of the circuit court that affirmed the Department's final administrative decision.[1]

¶ 5                                    I. BACKGROUND

¶ 6      This appeal involves the licensing of community-integrated living arrangements (CILAs) and the certification of developmental training (DT) programs. CILAs are living arrangements certified by a community mental health or developmental services agency under the CILA Licensure and Certification Act (Act), where eight or fewer recipients with mental illnesses or developmental disabilities reside under the supervision of the agency. 210 ILCS 135/3(d) (West

---

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

2016). CILA homes are intended to "promote independence in daily living and economic self-sufficiency" for the residents. *Id*. § 2. DTs are non-residential programs intended to prepare developmentally disabled adults to live and function in integrated social settings by promoting independence in daily living and economic self-sufficiency. 59 Ill. Admin. Code 119.100(a), (b) (eff. Aug. 23, 1999).

¶ 7 Under the Act, the Department issues a license to an agency to operate CILA homes. *Id*. §4. Agencies are a "public or private agency, association, partnership, corporation or organization." 210 ILCS 135/3(b) (West 2016). Licensure ensures that residents "are receiving appropriate community-based services, including treatment, training and habilitation or rehabilitation[,]" and "maintain[s] the integrity of [CILAs] by requiring regular monitoring and inspection of placements and other services provided." *Id*. § 4(b)(1), (3). CILA homes are subject to regular inspections by Department employees to evaluate compliance with Department standards. *Id*. § 4(g)(1).

¶ 8 Pursuant to the Illinois Administrative Procedure Act (5 ILCS 100/1-1 *et seq*. (West 2016)), the Department promulgated regulations to establish "minimum standards for licensing [CILAs] under the Act." See *id*. § 9; 59 Ill. Admin. Code 115.100 *et seq*. (eff. Aug. 13, 1999). Following an inspection, referred to as surveys, the Department grades the agency's overall compliance based on six levels. 59 Ill. Admin. Code 115.440(c) (eff. Aug. 13, 1999). Agencies with compliance Levels 1 through 3 remain in good standing. *Id*. With compliance Levels 3 through 5, agencies receive notice of the violations, a correctional plan, and sanctions. *Id*.; 210 ILCS 135/4(g)(2) (2016). For Levels 2 through 5, the Department may not revoke an agency's license without providing written notice. 59 Ill. Admin. Code 115.470(b) (eff. Aug. 13, 1999).

¶ 9 Level 6 compliance results in revocation of the agency's license. 59 Ill. Admin. Code 115.440(c)(6), (g)(4) (eff. Aug. 13, 1999). Revocation is warranted for "consistent and repeated failure to take necessary corrective actions to rectify documented violations, and/or the agency's failure to protect clients from situations that produce an imminent risk." 59 Ill. Admin. Code 115.440(c)(6) (eff. Aug. 13, 1999). Imminent risk is "[a] preliminary determination of immediate, threatened or impending risk of illness, mental injury, or physical injury to an individual as would cause a reasonably prudent person to take immediate action and that is not immediately corrected, such as environmental or safety hazards." 59 Ill. Admin. Code 115.120 (eff. March 17, 2003); see also 210 ILCS 135/6(b) (West 2016) (Department can immediately revoke an agency's license if operation of a CILA jeopardizes residents' health, safety or welfare).

¶ 10 The Department also issues one certificate per agency to operate DTs under the Mental Health and Developmental Disabilities Administrative Act. See 20 ILCS 1705/15.2 (2016). DTs must create, within 30 days of a client's entrance into the program, an "individual services plan" ("ISP") for that client. 59 Ill. Admin. Code 119.230(b) (eff. Aug. 23, 1999). An ISP is

> "[a] written plan which includes an assessment of the individual's strengths and needs[;] a description of the services needed regardless of availability[;] objectives for each service[; and] the role of the individual, guardian, significant others, and the family in the implementation, if the individual agrees to their participation. The plan shall also include a timetable for the accomplishment of objectives, and the names of the persons responsible for their implementation." 59 Ill. Admin. Code 119.120 (eff. June 25, 1997).

¶ 11 As with CILA homes, the Department must regularly survey DT programs to ensure compliance with Department regulations. 20 ILCS 1705/15.2 (2016); 59 Ill. Admin. Code

119.300(b) (eff. Aug. 23, 1999). A DT certificate must be immediately revoked if the Department "determines that individuals are at imminent risk which has not or cannot be corrected[.]" 59 Ill. Admin. Code 119.325(c) (eff. Aug. 23, 1999); see also 20 ILSC 1705/15.2 (West 2016) ("Department may suspend, refuse to renew, or deny certification to any provider who fails to meet any or all [ ] standards, as provided by rule"). Imminent risk, for DT certificates, is "[a] situation in which individuals in a program are or may be subject to mental, physical or psychological harm which is not immediately correctable, such as environmental or safety hazards." 59 Ill. Admin. Code 119.120 (eff. June 25, 1997). DT "[p]rograms shall not be located in buildings where individuals reside." 59 Ill. Admin. Code 119.200(e) (eff. Aug. 27, 1998).

¶ 12    Agencies may administratively appeal the revocation of a license or certificate by requesting a hearing. 59 Ill. Admin. Code 115.470(a) (eff. Aug. 13, 1999), 119.325(d) (eff. Aug. 23, 1999). Except when revocation is based on imminent risk, the agency may continue operations and receive reimbursements for services. 59 Ill. Admin. Code 115.470(b) (Aug. 13, 1999). A final administrative decision of the Department's secretary to revoke a license or certificate is subject to judicial review under the Administrative Review Law. 210 ILCS 135/7(c) (West 2016); 89 Ill. Admin. Code 508.150(a) (eff. Dec. 31, 2003).

¶ 13    Southwest Disabilities Services and Support (Southwest) had a license to operate eight CILA homes and a certificate for a DT program. Southwest renamed itself DSI, and the Department issued a provisional license and certificate to DSI in March 2016. Reuben Goodwin was executive director of both Southwest and DSI.

¶ 14    DSI's eight CILA homes were located in Chicago (with one location on Loomis Avenue and another on Eggleston Avenue), Homewood, Matteson, Chicago Heights (with one location on

193rd Place and another on 14th Place), Harvey, and Park Forest, Illinois. DSI's DT certificate was for a site in Hazel Crest, Illinois.

¶ 15    Within the Department, the Bureau of Accreditation, Licensure, and Certification (Bureau) issues CILA licenses and DT certificates and conducts compliance surveys. In 2015 and 2016, Felicia Gray was the Bureau chief. Following a mid-November 2016 survey, the Bureau rated DSI's overall CILA and DT programs as Level 5 compliance. The Bureau also determined that the Harvey CILA posed an imminent risk to its residents and ordered it be closed. Because of the low overall ratings, the Bureau ordered additional surveys by third-party contractors. On November 28, 2016, based on those additional surveys, the Bureau declared imminent risk for DSI's CILA and DT programs as a whole and revoked its license and certificate. DSI appealed the revocations to a Department ALJ on December 5, 2016.

¶ 16    Meanwhile, on December 1, 2016, DSI filed a complaint against the Department in the circuit court seeking injunctive relief to prevent the revocation of its provisional license and certificate. *Disability Services of Illinois, NFP v. Illinois Department of Human Services*, 2020 IL App (1st) 180024-U. After the circuit court dismissed the complaint for failure to exhaust administrative remedies (*id*. at ¶ 24), this court held that DSI could not avoid exhaustion because it "cannot succeed on a facial [constitutional] challenge based on vagueness grounds" (*id*. at ¶ 50). Specifically, this court held that there being "a certain amount of discretion in the determination of imminent risk does not leave the Department with no cognizable standard" (*id*. at ¶ 49), and DSI lacked "standing to make a facial constitutional challenge to the Code" because its "alleged conduct fell within the terms of" the imminent-risk definitions (*id*. at 51). This court also rejected DSI's argument that the Department lacked jurisdiction to revoke its license and certificate because

it failed to follow its own rules, holding that "the Department determined that an imminent risk existed, and having made that determination, it had the authority to act to protect the residents of DSI's CILA homes" and DT program participants. *Id*. at ¶¶ 53-55.

¶ 17    Meanwhile, a Department ALJ convened an administrative hearing, at which the Department had the burden to establish by a preponderance of the evidence that the revocations of DSI's license and certificate were warranted. At the hearing, 12 witnesses testified and both parties provided documentary evidence. During discovery, the parties agreed that the Department would produce relevant Bureau e-mails without attachments, and then DSI would request the specific attachments it wanted. The testimony and documentary evidence showed the following.

¶ 18    In March 2016, Southwest's annual DT survey resulted in a Level 2, 90% compliance rating. According to Gray and Bureau surveyor Sirleta Graves, Level 1, *i.e.*, 100% compliance, means that the agency has met the minimum standards set by the Department.

¶ 19    In late June 2016, Gregory Fenton, Director of the Department's Division of Developmental Disabilities, toured DSI's proposed new DT site and several CILA homes under renovation at Goodwin's invitation. Seeing homes under renovation left Fenton "pleasantly surprised," because he usually was shown only an agency's best locations. The proposed new DT site was located near the original one in Hazel Crest. By November 2016, the new site had failed two inspections by Bureau surveyors.

¶ 20    On November 14, 2016, the Bureau began its first survey of DSI's CILA homes and DT program under the provisional license and certificate. Graves, with Bureau surveyors Angela Johnson and Darlene Washington, visited all eight CILA homes, the DT site, and DSI's headquarters over the next four days. After comparing notes and discussing observations, they

rated DSI's CILA program at 56%, Level 5 compliance, and its DT program at 68%, Level 5 compliance.

¶ 21    Graves, Johnson, and Washington began the survey at the Hazel Crest DT site, but it was closed. They stated that the doors were locked, there was no furniture, and an eviction notice was on the window. Goodwin conceded that the Hazel Crest site was closed at the time. That address was the only one on record under DSI's DT certificate. Confused, Washington and Graves went to DSI's headquarters in Oak Forest, where they met with an employee named Gina Johnson (Gina). They testified that, when questioned, Gina said the DT program was in the community and provided a general schedule listing activities for the whole program; however, Gina could not provide any further detail on where individual participants were at any given time.

¶ 22    The surveyors noted additional violations based on a review of paperwork at headquarters. Specifically, DSI had inadequate staff to meet the minimum ratio with participants, and none of the staff members had completed the required training or background checks. Participants' ISPs still listed Southwest as the provider agency and did not address DSI's change of services from onsite DT programs at Hazel Crest to community-based programs. Those updates were required within 30 days of DSI beginning operations. The survey report also noted that DSI had no evacuation plans for Hazel Crest, and there was no evidence that quality assurance procedures were in place. Without a physical location and with the outdated ISPs and staff certifications, the report concluded that there was no evidence that a DT program actually existed.

¶ 23    At the Harvey CILA, Johnson observed extensive safety and cleanliness violations, including bugs, broken glass, mold, water damage, filthy facilities, and a stench so bad she had to leave. Because of the multiple significant issues, Johnson called Gray, who declared an imminent

risk situation and closed the home. Goodwin conceded imminent risk at Harvey and agreed with its immediate closure.

¶ 24    At the 14th Place CILA, Washington observed accessibility issues, which meant a wheelchair-bound resident had to be carried in and out of the home and could not use the bathroom without assistance. Washington was concerned by staff having to carry the resident because a trip could lead to injury and it prevented the resident from establishing independence. In addition, Washington observed insufficient lighting throughout the home, which posed an obvious tripping hazard. She also saw bugs in the kitchen and dining room. The survey report also noted that residents' ISPs were outdated, which Washington explained prevented onsite staff tracking and general oversight of whether the individualized services provided to residents were helping them establish and maintain independence and self-sufficiency.

¶ 25    At the Loomis CILA, Washington arrived at 6 a.m. Staff told her they had already administered the residents' medication, but the medicine log said that the medications were to be given around 7 or 8 a.m. Neither the staff nor driver, when a van arrived, could provide more detail about the residents' DT programming other than that it was "into the community." Washington observed insufficiently stocked bathrooms, outdated ISPs, and bedrooms with insufficient storage and lighting, holes in the ceilings and broken furniture. Beyond the cleanliness and habitability issues, Gray explained that these problems did not foster residents' independence. Also, the medications log listed certain medications as having been dispensed, but those medications were not onsite.

¶ 26    At the Homewood CILA, Johnson noted that the water temperature measured 143.6 degrees. The Bureau requires that hot water temperatures be between 100 and 110 degrees. Graves

and Gray explained that temperatures over 130 degrees can cause second or third degree burns, while those below the minimum meant cold showers or unsafe handwashing. Graves testified that the medications log lacked staff signatures for several dispensations, which could lead to staff re-administering medication. The survey report also logged violations for dirty bathrooms and the lack of closet doors in all the bedrooms.

¶ 27    At the Matteson CILA, Johnson arrived at 7 a.m., and the residents were being loaded into a van. Staff told her that the residents were going "to work," but could not provide additional details. She also observed that the home was in overall disrepair and the bedrooms had insufficient storage and missing closet doors.

¶ 28    At the 193rd Place CILA, Washington noted insufficient storage space and lighting in the bedrooms. One light looked like it was ready to fall off the ceiling, which could have shattered and cut someone. The survey report also noted water temperatures at 111 degrees, a hole in one bedroom's wall, and outdated resident ISPs.

¶ 29    At the Eggleston CILA, Washington visited at 6 a.m. All the residents were preparing to go out into the community, maybe for bowling or pizza, but staff could not provide any further details. Washington observed insufficiently stocked bathrooms, and bedrooms with insufficient storage, broken furniture, holes in ceilings, broken or missing light fixtures and a strong odor. The survey report also noted that ISPs were out-of-date; staff members were not authorized to administer medications but were doing so, including psychotropic medications; and the water temperature measured 134.4 degrees.

¶ 30    At the Park Forest CILA, Graves observed in the stairwell leading to the second floor a light switch at the top of the stairs only, which meant that residents could not turn on the lights

from the bottom of the stairs. She described the bedrooms and bathrooms as unsanitary, lacking supplies, and unfurnished. They also lacked sufficient lighting, with an exposed bulb in a sconce at shoulder height, which Gray stated could burn a resident. A CILA resident told Graves that they did not like the DT programming, which involved going to Goodwin's church, watching TV, or doing janitorial work.

¶ 31    The surveyors also identified administrative violations among all the CILAs. None of the homes had updated ISPs. Many residents' files were missing documentation regarding behavior plans or psychotropic medication. CILA staff were missing critical certifications, including medication administration compliance and CPR training. All eight CILAs lacked postings of emergency procedures or records that drills occurred regularly. The survey report also noted a dearth of evidence of ongoing quality assurance procedures.

¶ 32    The survey report ended with a requirement that DSI submit a plan of correction by December 19, 2016. Both Goodwin and Graves signed the report.

¶ 33    Gray explained that when an agency receives a Level 5 rating, the Bureau requires additional monitoring by independent service coordinators (ISCs)—third parties that conduct monitoring services on the Bureau's behalf—while the agency corrects the violations. This additional monitoring began on November 19, 2016 for DSI and was intended, according to ISC Myria Freeman, to ensure the safety and well-being of residents.

¶ 34    On November 19, 2016, Freeman visited the Matteson, 193rd Place, and Homewood CILAs. At the Matteson CILA, she observed the kitchen in bad repair with appliances heavily coated in grime, while the bedrooms, bathrooms, and laundry room were "filthy."

¶ 35    Next, at the 193rd Place CILA, Freeman encountered dirty bedrooms with inadequate storage, broken furniture, inadequate lighting, holes in walls, and a very strong odor. One of the two bathrooms was out of order. Freeman assessed that the amount of grime and disrepair could not have accumulated since the survey on November 15.

¶ 36    Two residents at the Homewood CILA told Freeman their bedrooms were very cold and a third resident informed Freeman that they had insufficient storage and the furniture was in disrepair, all of which Freeman confirmed. Freeman also observed a "filthy" kitchen and bathrooms, and an unsecured hardware drawer. A fourth resident told her that they wanted to start DT programming again because they were bored.

¶ 37    On November 21, 2016, another ISC, Ruth Aguilar, visited the Eggleston CILA, which she described as "chaotic," with a resident who kept tripping because his pants were falling down while the single staff member was busy dealing with another resident. The house was dirty, with stained carpets.

¶ 38    A third inspection of the proposed DT site also occurred on November 21, but the site again failed and the Bureau denied certification.

¶ 39    On November 22, 2016, Freeman returned for additional monitoring at the Matteson, Homewood and 193rd Place CILAs, as well as visiting the 14th Place CILA. She described the conditions at the Matteson, 193rd Place, and Homewood CILAs as unchanged.

¶ 40    A Homewood CILA resident again expressed how bored they were doing nothing all day and another expressed displeasure with DSI.

¶ 41    At the 193rd Place CILA, Freeman found 24 or 25 residents in the home with only two staff members. Gray stated that those two staff members were DT employees and thus not trained

for managing a CILA home, including medication safety or emergency plans. Freeman observed the residents milling around, without any structured activities. The monitoring report noted that staff said there were no outings planned, but they would work on money management. Freeman said staff could not provide her with an explanation for so many residents being in the home.

¶ 42    At the 14th Place CILA, Freeman explained that the exterior of the building was in bad repair. The kitchen had an unlocked chemical storage cabinet and hazards for the wheelchair-bound resident. The bathrooms were dirty, inadequately stocked, and had an unpleasant odor. She also noted that the basement door was unlocked, making a box of broken Plexiglas and paint supplies easily accessible. The basement was filthy, with what appeared to be water damage and mold.

¶ 43    On November 25, 2016, David Ogunbode, the executive director of an ISC, conducted additional monitoring at the Eggleston CILA. Only one staff member was present, which Ogunbode opined was inadequate for six residents—especially because one had a contract for one-on-one care. That resident was covered in urine and the other residents were unsupervised. Bedrooms were too small to accommodate the residents and had broken furniture. There were no window blinds in the bathrooms; cleaning chemicals were left out and accessible in the kitchen; and the basement door was unlocked, allowing access to a steep, dark stairwell and more chemicals. A smell of urine permeated the house.

¶ 44    ISC Tanda Perkins visited the Park Forest CILA the same day and noted that the kitchen water had a strong, pungent odor. Perkins also observed that there was no light switch at the bottom of the stairwell, which could lead a resident to fall. When asked about where residents in the DT program had gone, staff provided no details.

¶ 45    On November 26, 2016, Ogunbode returned to the Eggleston CILA, where the conditions remained unchanged, including the same, single staff member onsite who could not properly care for the residents. In addition, the medicine cabinet was not properly secured and residents could reach inside, but the staff member with the key was not onsite. Ogunbode also opined generally that he was not surprised by the conditions at Eggleston, including low staffing, because DSI always had these same issues. He stated that DSI would fix issues when noted, but the same problems would reappear soon. Thus, while all of the issues he observed at Eggleston could be easily corrected, DSI had not done so.

¶ 46    Gray explained that, beginning on November 16, 2016, she began considering whether to declare an imminent risk for DSI's DT and CILA programs. Gray, Johnson, Washington, and Graves all testified that Gray, as head of the Bureau, had sole authority to declare an imminent risk. An imminent risk declaration, Gray explained, is a totality of the circumstances determination based on the regulatory definitions. She considers why issues are present, how the agency has created or resolved the issues, failure to implement a plan of correction, problems across multiple locations, and what quality assurance procedures are in place.

¶ 47    Based on the results of the increased monitoring surveys, Gray decided to declare an imminent risk on November 23. For DSI's CILA homes, Gray pointed to the lack of improvement and the two dozen residents at the 193rd Place CILA on November 22. The declaration, overall, was also based on systemic issues across every home, which consistently failed to comply with the minimum standards for safety and cleanliness, or correct issues identified by surveyors. These failures demonstrated gross mismanagement and put residents at severe risk of harm.

¶ 48 Gray also concluded that there did not appear to be an actual DT program because the only certified site was shuttered, and neither onsite nor headquarters staff could provide participants' locations. Worse, staff seemed unconcerned by this, which showed a disregard for participants' health and safety. The presence of two dozen participants at the 193rd Place CILA on November 22 also demonstrated commingling of the DT program with the CILA program, which was not allowed and created further imminent risk due to the homes' conditions. Thus, even though DSI had been given 30 days to submit a plan of correction, Gray determined that the circumstances as a whole demonstrated that imminent risk needed to be declared right away. As she explained, "[t]here is no time frame on people's health and safety."

¶ 49 The Bureau officially moved DSI's license and certificate statuses to Level 6, revoked both, and informed DSI on November 28, 2016. The letter notifying DSI stated that the CILA license revocation was due to "health and safety violations *** found in all 8 of DSI's homes," including: the Harvey CILA imminent risk declaration; excessive hot water temperatures; bedrooms that were not dry and comfortable; holes in walls; insufficient storage for residents' belongings; and insufficient lighting. The license and certificate were also revoked for administrative violations, including no updated ISPs or procedures to do so; no evidence that programming was being provided consistent with participants' ISPs; no evidence that the certified DT Hazel Crest site was in use; and participants found in CILA homes without any DT programming.

¶ 50 Goodwin testified on behalf of DSI. He described the condition of the CILA homes in November 2016 as "great." After the November 14-17 survey, DSI worked to fix "the things that were true" and "legitimately wrong such as the water temperature at some of the sites." Goodwin conceded that the Harvey CILA posed an imminent risk, but denied that the ISCs could have

observed poor conditions at the other homes, specifically calling Ogunbode's statements "ridiculous" and "a lie."

¶ 51    For the DT program, Goodwin conceded that DSI had not used the Hazel Crest site since the middle of September, but claimed he had informed the Bureau of this. He agreed that the proposed site was not approved and acknowledged that DSI used the location. He stated that while DSI awaited approval, DT programming was out in the community and claimed that a Bureau employee had approved this arrangement. Goodwin claimed that DSI had schedules for the community programming. He also denied that his employees were unable to tell the surveyors where DT participants were.

¶ 52    As for the incident involving two dozen participants at the 193rd Place CILA, he stated that they were waiting for a storm to pass so they could take a trip to Indiana. While they waited, they were mostly outside on the large property until rain forced them inside. Goodwin acknowledged, however, that his knowledge of these events was from a phone conversation with a staff member. Goodwin said that it was common for participants and residents to go to CILA homes with large yards for social events, but denied that DSI hosted DT programming at CILA homes.

¶ 53    Regarding ISPs, Goodwin testified that DSI was updating them, but based on yearly expiration, regardless of the listed agency. They struggled updating ISPs because, despite their provisional license and certificate issuing in March 2016, they could not do anything until the July 1 effective date. He further stated that every staff member's background checks were valid within the past year, but that DSI had difficulty conducting new checks after July 1 because the system

kept returning the checks with Southwest as the agency. He asserted that he and his staff tried to show this issue to the surveyors.

¶ 54    Goodwin said that the CILA homes had emergency drills, but that the surveyors refused to accept that documentation at headquarters because he took too long retrieving it from the files. Graves explained that the Bureau has a policy that if agency officials are taking too long to find a record, then the Bureau considered it a violation out of a concern that the agency could be trying to falsify it. Goodwin's objection to this was noted on the survey report.

¶ 55    Goodwin claimed that the real motivation for the revocation was political. He stated that a recent series of Chicago Tribune investigative reports on conditions in CILA homes and the Department's oversight had led to hearings before the General Assembly. Goodwin asserted that the Bureau chose to make an example of DSI to make it look like the Department was cracking down. Gray stated that the Chicago Tribune articles had nothing to do with the timing of the surveys or the imminent risk determination.

¶ 56    The ALJ issued a report and recommended affirming the Bureau's November 28, 2016 revocation of DSI's CILA license and DT certificate. The Department secretary adopted the ALJ's report and recommendation as her final decision on July 9, 2019. The secretary declined to address DSI's arguments that the Department violated the Illinois Administrative Procedure Act because the definition of imminent risk was overly broad and the Department failed to promulgate guidance to implement imminent risk determinations. The secretary also rejected DSI's argument that the survey initiation in November 2016 was unauthorized because it was less than nine months from DSI's beginning of operations in July 2016.

¶ 57    The secretary concluded that a preponderance of the evidence showed an imminent risk to residents from DSI's CILA program at an administrative level. Specifically, DSI's haphazard documentation and administration of medication at multiple CILA locations clearly demonstrated endemic agency failure to monitor its residences and train its staff, resulting in conditions that posed a risk of imminent harm to program participants. The secretary found that DSI had incomplete and outdated ISPs, which indicated that DSI took a haphazard, generalized approach to treatment. Without these documents onsite, DSI's staff was unaware of residents' specific needs, and thus it was unclear how DSI or its staff ensured that appropriate treatment was being provided. Also, the multiple incidents of understaffing showed that DSI was either unaware of or unwilling to remedy the issue, which exemplified "the causal relationship between DSI's administrative failings and the imminent risk to its residents." Furthermore, DSI's CILA program had a systemic lack of disaster preparedness, which clearly posed an immediate risk to residents. Also, DSI lacked administrative procedures to monitor compliance and remediate problems. No evidence showed that either all of DSI's environmental defects would ultimately have been discovered or plans existed to implement solutions. In addition, Goodwin's testimony failed to refute the Bureau's evidence of violations and lacked credibility because it was mostly based on secondhand information. The secretary concluded, therefore, that the Department established by a preponderance of the evidence that DSI's administrative procedures created hazardous conditions posing an imminent risk of harm to residents.

¶ 58    The Secretary also concluded that the Department demonstrated imminent risk through environmental conditions at DSI's CILA homes, listing the hazardous conditions at each CILA home and stating that the overall condition of the premises constituted an imminent risk of harm

to the residents. Specifically, (1) the Loomis CILA had dirty facilities, inadequate storage and lighting, holes in the ceiling, and a medication log stating that a resident had received prescriptions even though the medication was not onsite; (2) the Eggleston CILA had water temperatures at 132.4 degrees, bedrooms smelling of human excrement, bedrooms lacking sufficient storage or lighting, one bedroom had a hole in the ceiling, and insufficient staffing that resulted in altercations between residents; (3) the 14th Place CILA had vermin and mold, lacked handicap accessibility, had unsecured chemicals, sharp tools, and broken glass, had dirty bathrooms without necessary supplies, and lacked sufficient storage and lighting; (4) the Homewood CILA had water temperature measuring 143.6 degrees, unclean and unsafe bathrooms, bedrooms, and common areas, and insufficient evidence to show that its staff was licensed to administer medication; (5) the Matteson CILA had extremely dirty and inadequately stocked bathrooms, bedrooms, and common areas, which was not remedied by the time of additional monitoring visits; (6) the Park Forest CILA had extremely dirty bedrooms and bathrooms that lacked sufficient storage and lighting, and lacked linens and blankets; and (7) the 193rd Place CILA had high water temperatures, the presence of 25 individuals at the residence on November 22, holes in the ceilings and walls, insufficient storage and lighting, and bathrooms that were not fully functional or stocked. The secretary rejected DSI's attempts to rebut the Department's evidence, finding that the evidence about prior visits to DSI's CILA homes was not compelling because those visits significantly predated the November 2016 surveys. The secretary likewise rejected DSI's argument that the Department should have allowed DSI to fix the identified violations and closed only specific CILA homes because the regulations allowed immediate revocation for the failure to implement corrections or protect residents' health and safety.

¶ 59   Furthermore, the secretary concluded that a preponderance of the evidence supported an imminent risk from DSI's DT program because no evidence showed that DSI had any viable DT program. The Hazel Crest DT site, which was DSI's only certified site, was vacant and Gina at DSI headquarters could not provide specific information about participants' location or activities other than being "in the community." The secretary noted that DSI could not credibly assert that it was able to ensure the safety of program participants if DSI could not even ascertain where they were. Moreover, DSI had conceded that its proposed DT site had not yet been certified but admitted to using that site anyway. This created imminent risk because the proposed space could not have passed health and safety inspections. Goodwin also had admitted that DT programming— including social events and staging for group outings—occurred in CILA homes, including on November 22 at the 193rd Place CILA. This repeated admitted use of CILA homes for DT programming confirmed the Bureau's assessment that DSI inappropriately commingled the programs. The secretary found that DSI failed to provide the surveyors with updated ISPs and presented no evidence that it provided individualized treatment for participants beyond Goodwin's discredited vague and secondhand testimony. The secretary concluded that "[i]n the absence of any rebuttal testimony or evidence, and the Department's convincing showing to the contrary, it is found that, at best, DSI undertook a haphazard, generalized approach to treatment that [failed to comply with the Department's regulations and precluded the agency from knowing] a participant's specific needs, goals or prior accomplishments."

¶ 60   DSI sought administrative review before the circuit court, arguing that (1) the Department lacked guidelines for imminent risk determinations, (2) the Department acted outside its statutory authority by failing to follow its own regulations and policies, (3) contrary evidence showed that

the secretary's factual findings regarding alleged violations were against the manifest weight of the evidence, (4) the secretary's conclusion that imminent risk existed was arbitrary because Gray based her revocation determination on reports from a single surveyor and before reading all the additional monitoring reports, and many of the cited reasons for revocation were either immediately corrected or correctable, (5) several of the reasons that the secretary found supported revocation were not cited in the Bureau's November 28 revocation notice, and (6) the Department and Bureau targeted DSI in response to investigative reporting by the Chicago Tribune.

¶ 61    On April 26, 2021, the circuit court affirmed the secretary's final administrative decision revoking DSI's license and certificate. DSI moved the court to reconsider, which the court denied on March 28, 2022. Meanwhile, DSI appealed.

¶ 62                                  II. ANALYSIS

¶ 63                        A. Motion to Strike and Dismiss Appeal

¶ 64    The Department moves this court to strike DSI's brief and dismiss the appeal due to DSI's failure to comply with Illinois Supreme Court Rule 341 (eff. Oct. 1, 2020). First, the Department argues that DSI's three-page fact statement violates Rule 341(h)(6) because it does not contain the facts necessary for a thorough understanding of the case relevant to DSI's appeal where the common-law record is nearly 3,600 pages, a supplemental record is 160 pages, and the final administrative decision is 50 pages.

¶ 65    As the appellant, DSI bears the particular responsibility to present an accurate factual statement. See Ill. Sup. Ct. R. 341(i) (providing that the appellee's response brief may, but need not, include a fact statement). This burden is especially important here because of the large record with many relevant facts. *Cf. Ellis v. Flannery*, 2021 IL App (1st) 201096, ¶ 8 (forgiving

noncompliant fact statement "because the record is simple" and "straightforward"). "[A]lthough an appellant may present evidence favorable to his position in the statement of facts, he cannot do so at the cost of this court's understanding of the case." *Marzouki v. Najar-Marzouki*, 2014 IL App (1st) 132841, ¶ 12.

¶ 66    Second, the Department argues that DSI's arguments lack citation to supporting authority, as required by Rule 341(h)(7). Specifically, DSI's first argument provides citations for only two general legal propositions. DSI's second and third sections do not cite a single case. According to the Department, DSI has left this court to conduct legal research on DSI's behalf. See *Prakash v. Parulekar*, 2020 IL App (1st) 191819, ¶ 36 ("reviewing court is not a repository into which a party may dump the burden of argument or research").

¶ 67    Our appellate procedural rules are not merely suggestions, and the failure to comply with them is not an inconsequential matter. *Hall v. Naper Gold Hospitality, LLC*, 2012 IL App (2d) 111151, ¶ 7. Violations of these rules may result in dismissal of an appeal when the violations interfere with or preclude our review. *In re Detention of Powell*, 217 Ill. 2d 123, 132 (2005) (where Supreme Court Rules violations hinder this court's review, it may strike the brief and dismiss the appeal, strike the improper material, or disregard the improper material).

¶ 68    DSI's failure to comply with the Rules interferes with but does not preclude our review of the issues raised. Accordingly, this court will disregard DSI's fact statement and any unsupported arguments in its brief. See *State by Raoul v. Hitachi, Ltd.*, 2021 IL App (1st) 200176, ¶ 49 (disregarding arguments unsupported by authority).

¶ 69                              B. The Standards of Review

¶ 70      On administrative review, the standard of review depends on whether the question

presented is one of fact, law, or a mixed question of fact and law. *Cinkus v. Village of Stickney*

*Municipal Officers Electoral Board*, 228 Ill. 2d 200, 210 (2008). This court reviews the final

administrative decision of the Secretary, not the circuit court's judgment. *Williams v. Department*

*of Human Services, Division of Rehabilitation Services*, 2019 IL App (1st) 181517, ¶ 20.

¶ 71      Pure questions of law are reviewed *de novo*. *Id*. at ¶ 21. The secretary's findings of fact, on

the other hand, are deemed *prima facie* true and correct (735 ILCS 5/3-110 (2016)), and will not

be disturbed unless they are against the manifest weight of the evidence (*Williams*, 2019 IL App

(1st) 181517, ¶ 21). Under this deferential standard, the secretary's factual findings must be

affirmed unless the opposite conclusion is clearly evident. *Abrahamson v. Illinois Department of*

*Professional Regulation*, 153 Ill. 2d 76, 88 (1992). On administrative review, courts do not

"reweigh the evidence or make an independent determination of the facts." *Id*. Thus, "[i]f the

record contains evidence that supports the agency's determination, it must be affirmed." *Illinois*

*Department of Human Services v. Porter*, 396 Ill. App. 3d 701, 723 (2009).

¶ 72      When the secretary applies legal standards to findings of fact, her determination is on a

mixed question of law and fact that is reviewed deferentially under the clearly erroneous standard.

See *American Federation of State, City, & Municipal Employees, Council 31 v. Illinois State Labor*

*Relations Board*, 216 Ill. 2d 569, 577-78 (2005). A decision is not clearly erroneous unless the

reviewing court "is left with the definite and firm conviction that a mistake has been committed."

*Id*.; see also *Vincent ex rel. Reed v. Department of Human Services*, 392 Ill. App. 3d 88, 93 (2009)

(deference acknowledges "agency's experience and expertise in resolving matters under its jurisdiction").

¶ 73                     C. Guidelines for Imminent Risk Determinations

¶ 74    DSI argues that the Act and Department rules do not establish sufficient guidelines for imminent risk determinations and the secretary's application of the rules to its case constituted illegal rulemaking.

¶ 75    Whether the secretary's decision is void for failure to establish guidelines for imminent risk determinations is a question of law reviewed *de novo*. See *Goral v. Dart*, 2019 IL App (1st) 181646, ¶¶ 41, 52.

¶ 76    As an initial matter, DSI has forfeited these arguments by failing to develop them and citing only two cases for general purposes. See *Olive Portfolio Alpha, LLC v. 116 W. Hubbard St., LLC*, 2017 IL App (1st) 160357, ¶ 42 ("bare citation to a statute and citations to general" principles results in forfeiture). DSI then cites no authority for any of its other assertions. "[A]rgument lacking analysis of relevant authority or a cohesive legal argument regarding their application is forfeited." *Northwest Illinois Area Agency on Aging v. Basta*, 2022 IL App (2d) 210234, ¶ 68.

¶ 77    Forfeiture aside, the regulatory definitions provided sufficient guidelines for imminent risk determinations, both as a matter of administrative and constitutional law. With respect to the former, licensing regulations need not provide "specific rules articulating each and every appropriate procedure to be followed ***, under every conceivable circumstance[.]" *Litchfield Terrace, Ltd. v. Department of Public Health*, 252 Ill. App. 3d 1090, 1099 (1993). Such a requirement would be "unduly burdensome *** and may not be used as a rationale to allow the [licensed] facility to evade its statutory and regulatory responsibilities to" the individuals in its

- 24 -

care. *Id.*; see also *Wilson v. County of Cook*, 2012 IL 112026, ¶ 23 (less precision in statutory language required when penalties are civil, not criminal). Regulations are presumed valid, and the party challenging the regulation "carries the burden of clearly rebutting this strong judicial presumption." *Wingert by Wingert v. Hradisky*, 2019 IL 123201, ¶ 28; see *People ex rel. Madigan v. Petco Petroleum Corp.*, 363 Ill. App. 3d 613, 628 (2006) (same rules for the construction of statutes apply to regulations).

¶ 78    Here, imminent risk for CILA licenses is an "immediate, threatened or impending risk of illness, mental injury, or physical injury to an individual as would cause a reasonably prudent person to take immediate action and that is not immediately corrected, such as environmental or safety hazards." 59 Ill. Admin. Code 115.120 (eff. March 17, 2003). For DT certificates, it is "[a] situation in which individuals in a program are or may be subject to mental, physical or psychological harm which is not immediately correctable, such as environmental or safety hazards." 59 Ill. Admin. Code 119.120 (eff. June 25, 1997). Although these definitions do not enumerate every applicable circumstance, they sufficiently cabin covered conduct by identifying the types of harm at issue (illness, mental, physical, or psychological harm) and when such harm is imminent (a reasonably prudent person would act and not immediately correctable). See *Litchfield Terrace*, 252 Ill. App. 3d at 1098-99 (sufficient guidelines provided by regulation allowing revocation of license for failure to "[p]rotect[ ] the health, welfare, and safety of residents").

¶ 79    Furthermore, the imminent risk definitions are not unconstitutionally vague. Under due process void-for-vagueness standards, "a statute's terms must be explicit enough to serve as a guide to those who must comply with it, but mathematical certainty is not required." (Internal

quotations omitted.) *Morgan v. Department of Financial & Professional Regulation*, 374 Ill. App. 3d 275, 292 (2007). That some terms are ambiguous is insufficient—the regulation must be "incapable of any valid application in the sense that no standard of conduct is specified at all." (Internal quotations omitted.) *Id*. at 292-93. Moreover, for a vagueness challenge to a regulation that does not implicate First Amendment interests, if the challenger's "conduct clearly falls within the proscribed conduct," then the regulation is not unconstitutionally vague "even though [it] may be vague as to other conduct." *Petco Petroleum*, 363 Ill. App. 3d at 631.

¶ 80    The conditions at DSI's CILA homes, the state of its DT program, and its grossly deficient administrative procedures all clearly created a risk of physical, emotional, or psychological harm to its clients that could not be easily corrected and would cause a reasonably prudent person to act. *Id*. at 632 (rejecting vagueness challenge where "[n]o colorable argument can be made that" challenger's conduct did not fall within regulatory language). Statutes and regulations with similar standards have been repeatedly upheld as not unconstitutionally vague. E.g., *Morgan*, 374 Ill. App. 3d at 292-93 (allowing revocation of license for "imminent danger to the public"); *Escalona v. Board of Treasurers, State Employees Retirement System*, 127 Ill. App. 3d 357, 361 (1984) (individual eligible for benefits if "found upon medical examination to be mentally or physically incapacitated to perform the duties of the [individual's] position").

¶ 81    On appeal, the basis for DSI's insufficient guidelines argument is unclear. While DSI contends that the imminent risk definitions are so broad as to provide "no notice as to what offense could result in licensure revocation *** [which is] a classic violation of due process," DSI does not discuss the void-for-vagueness standards or how the regulations here met those standards. Assuming DSI is asserting a void-for-vagueness violation, then it fails because the imminent risk

definitions do not implicate First Amendment conduct—only CILA home and DT program conditions and administrative procedures—and DSI's failure to explain how its conduct fell outside the imminent risk definition is sufficient to reject its vagueness challenge.

¶ 82    DSI's only specific vagueness argument is that the regulations' broad language left Department employees to use "any fact in existence to justify" revocation. Particularly, DSI contends that a single lightbulb being "too dim to read a book by" was used as the main justification for revoking its CILA license, whereas a resident in another agency's home died. DSI fails to cite the record in support of its single lightbulb justifying revocation, or identify which home it occurred in. Worse, DSI omits the extensive evidence of non-illumination-related issues identified in all eight CILA homes, the lack of evidence of a DT program existing, and the evidence of its serious administrative deficiencies. DSI also provides no context for the resident's death at another agency's home, including when or where it occurred, or explain why it is relevant to the Department's determination in this case. Moreover, the ALJ struck all portions of DSI's arguments referring to that incident because he had previously ruled such evidence inadmissible, a ruling DSI fails to challenge and so has forfeited. See *Life Energy, LLC v. Illinois Commerce Commission*, 2021 IL App (2d) 200411, ¶ 115 (arguments not raised in opening brief are forfeited).

¶ 83    Similarly, DSI fails to explain how the imminent risk definitions purportedly lacked guidelines grounded in the Act. Regardless, section 6(b) of the Act clearly provides a statutory source for the regulatory definitions: "If the Department determines that the operation of a [CILA home or program] jeopardizes the health, safety or welfare of the recipients served by the agency, the Department may immediately revoke the agency's license." 210 ILCS 135/6(b) (2016). Both regulatory imminent risk definitions track this statutory language: "immediate, threatened or

impending risk of illness, mental injury, or physical injury to an individual" (59 Ill. Admin. Code 115.120 (eff. March 17, 2003)), and "[a] situation in which individuals in a program are or may be subject to mental, physical or psychological harm which is not immediately correctable" (59 Ill. Admin. Code 119.120 (eff. June 25, 1997); see also 20 ILCS 1705/15.2 (2020) (allowing suspension, non-renewal, or denial of DT certificate for failure "to meet any or all [ ]standards, as provided by [Department] rule")).

¶ 84    DSI also makes the conclusory and contradictory assertion that, "[d]espite" the regulations defining imminent risk, the Department "failed to ever file a proposed rule or emergency rule *** to establish criteria for a finding of imminent risk." DSI asserts that this failure constitutes illegal rulemaking because it means "there must exist an informal practice of internal method/list of criteria [which] is a classic example of illegal rulemaking." DSI also asserts that this constitutes illegal rulemaking because it left those guidelines within the discretion of Department employees, as demonstrated by testimony DSI characterizes as showing no guidelines existed. However, DSI failed to raise its illegal rulemaking arguments before the Department, thus forfeiting them. See *My Baps Construction Corporation v. City of Chicago*, 2017 IL App (1st) 161020, ¶ 101.

¶ 85    Regardless, the very definitions DSI cites and quotes in full are the ones the Department promulgated providing the criteria. See 59 Ill. Admin. Code 115.120 (eff. March 17, 2003), 119.120 (eff. June 25, 1997). Such definitions and rules need not "cover every conceivable issue." *Basta*, 2022 IL App (2d) 210234, ¶ 56. Moreover, the Department's application of the definitions to the facts of DSI's case does not constitute improper rulemaking. E.g., *Alternate Fuels, Inc. v. Director of the Illinois Environmental Protection Agency*, 215 Ill. 2d 219, 247-48 (2004); *cf. Van*

*Dyke v. White*, 2019 IL 121452, ¶¶ 91-94 (even "erroneous interpretation of" statute or regulation as applied to specific "case does not constitute improper rulemaking").

¶ 86    Contrary to DSI's characterization of Gray's testimony as showing "that a finding of inadequate lighting could pose imminent risk," Gray actually said that "systemic" lighting issues across multiple homes would be "an issue" and is what occurred here. DSI is correct, however, that Gray testified that there was no one factor or set of circumstances that the Bureau looked to or that was dictated by the rules that mandated a finding of imminent risk. This is because imminent risk is a totality-of-the-circumstances analysis concerned with physical and mental health hazards. Again, such regulatory language need not cover every possible situation and the Department's application of the rule to the facts of DSI's case does not constitute illegal rulemaking.

¶ 87    Finally, DSI relies on the general proposition that "an agency must 'define as clearly and precisely as possible the standards by which it will exercise its discretionary power in order to inform those affected.' " (quoting *Guzzo v. Snyder*, 326 Ill. App. 3d 1058, 1062 (2002)). *Guzzo*, however, involved the extension of a statutory exception through an unwritten policy in a way that lacked any grounding in either the statute or regulation. See *id*. at 1062-63. Here, as discussed, the regulatory imminent risk definitions closely track the statutory language.

¶ 88                    D. Department's Compliance with Policies and Procedures

¶ 89    DSI next argues that the Department did not follow its own policies and procedures. DSI fails, however, to cite authority in support of these contentions, again resulting in forfeiture. Nevertheless, DSI's arguments lack merit.

¶ 90    Whether the Department acted beyond its statutory authority is a question of law reviewed *de novo*. See *Goral*, 2019 IL App (1st) 181646, ¶¶ 41, 52.

¶ 91    DSI first contends that the Department violated its own rules by revoking the license and certificate without providing an opportunity to correct the violations. This is incorrect for three reasons. First, as the secretary found, DSI had this opportunity while the additional monitoring occurred. Second, again as the secretary found, the monitoring reports led Gray to determine imminent risk and downgrade DSI to Level 6. Because these findings are supported by record evidence, they were not against the manifest weight of the evidence. See *Porter*, 396 Ill. App. 3d at 723. Third, as the secretary determined, a Level 6 rating can be imposed whenever the Department determines imminent risk. See 210 ILCS 135/6(b) (2016); 59 Ill. Admin. Code 115.440(c)(6), (g)(4) (eff. Aug. 13, 1999). Once the Level 6 rating was in place, DSI was no longer entitled to the correction and re-survey procedures for a Level 5 rating. See 59 Ill. Admin. Code 115.440(d) (eff. Aug. 13, 1999) (agency may correct violations "except in cases" where "emergency action is necessary to protect the public or individual interest, safety or welfare").

¶ 92    DSI also claims that the Bureau failed to appoint a Department employee as "Division monitor" to oversee its post-survey progress, as required by 59 Ill. Admin. Code 115.440(g)(3) (Aug. 13, 1999). However, DSI fails to cite evidence supporting this contention or authority supporting DSI's assertion that the monitor was required to be a Department employee, thus forfeiting these arguments. See *Hitachi, Ltd.*, 2021 IL App (1st) 200176, ¶ 49. Regardless, the language of the rule only requires that "a Division monitor *** oversee the progress of the agency in taking corrective action," not that the monitor or the surveyors be Department employees. *Id.* Moreover, Gray testified that she received and reviewed the additional monitoring reports, thus fulfilling the Division monitor role.

¶ 93    Next, DSI asserts that the Department violated its own rules because the documents used by the Bureau surveyors to score DSI's compliance had ratings only for Levels 1 through 5, whereas the Administrative Code includes Level 6. Thus, DSI concludes, its Level 6 rating was applied without any objective standards or guidelines and it was entitled to the Level 5 correction procedures. This argument lacks merit. A Level 6 rating is based on a finding of imminent risk (see 59 Ill. Admin. Code 115.440(c)(6) (eff. Aug. 13, 1999)), which, as discussed, has sufficient guidelines in the regulatory definitions. Moreover, the surveyors had a list of conditions warranting immediate consultation with Gray about imminent risk.

¶ 94    DSI also claims, without further explanation, that the Department conducted inaccurate and incomplete surveys. Such conclusory arguments are forfeited. *Alms v. Peoria County Election Commission*, 2022 IL App (4th) 220976, ¶¶ 28-30 (argument consisting of two conclusory sentences forfeited). Regardless, the testimony DSI cites to support the surveys' alleged inaccuracy shows merely that Johnson sometimes made handwritten notes on the survey report about an early 2016 follow-up survey regarding specific violations at a particular CILA home and not the November 2016 general survey of the entire program. This does not show that the Department failed to follow its rules.

¶ 95    This court rejects DSI's arguments that the Department failed to follow its own regulations and procedures.

¶ 96                        E. Final Administrative Decision

¶ 97    As with DSI's other arguments, its contentions regarding the merits of the secretary's order are forfeited for failure to cite supporting authority. Regardless, the secretary's factual findings

were not against the manifest weight of the evidence and her imminent risk determinations were not clearly erroneous.

¶ 98    The secretary's factual findings—including witness credibility and the condition of the CILA homes and DT program—are reviewed under the manifest weight standard. See *Abrahamson*, 153 Ill. 2d at 88. The secretary's overall conclusion that the license and certificate should be revoked due to imminent risk is reviewed for if it is clearly erroneous. See *Senno v. Department of Healthcare & Family Services*, 2015 IL App (1st) 132837, ¶ 41. The secretary made extensive factual findings regarding DSI's administrative procedures, the conditions at the CILA homes, and the DT program.

¶ 99    First, the secretary found that DSI had deficient administrative processes, including haphazard documentation and administration of medication; incomplete, outdated, and missing ISPs; chronic understaffing; systemic lack of disaster preparedness; and insufficient quality assurance procedures. As set forth in detail above, the record evidence supports these fact findings. Because record evidence supports all of these findings, they were not against the manifest weight of the evidence. See *Porter*, 396 Ill. App. 3d at 723.

¶ 100   The secretary's determination that these administrative deficiencies caused imminent risk to CILA residents was not clearly erroneous. Without updated ISPs, staff could not know residents' specific needs, making it unclear how the agency ensured appropriate treatment was being provided to establish and maintain independence and self-sufficiency, which is the purpose of the CILA program. The understaffed, uncontrolled environments were especially concerning given the frequency of unsecured medications, chemicals, and sharp objects. Inadequate disaster preparedness clearly posed an immediate risk to residents because procedures and drills ensured

that residents and staff knew what to do in an emergency. DSI's failure to present any evidence that it had quality assurance procedures at its multiple locations showed that DSI could not identify and resolve any of these issues.

¶ 101   The combination of these systemic failures demonstrates an "immediate, threatened or impending risk of illness, mental injury, or physical injury to an individual as would cause a reasonably prudent person to take immediate action" (59 Ill. Admin. Code 115.120 (eff. March 17, 2003)), and so do not lead to a definite and firm conviction that the determination was a mistake (see *Council 31*, 216 Ill. 2d at 577-78. Any imminent risk determination leads to revocation of a CILA license (see 59 Ill. Admin. Code 115.440(c)(6), (g)(4) (eff. Aug. 13, 1999)), and the Department is authorized to revoke a CILA license if the health, safety, or welfare of residents is jeopardized (210 ILCS 135/6(b) (2020)).

¶ 102   Second, regarding the conditions of the CILA homes, extensive record evidence supports the secretary's findings that bathrooms were dirty and inadequately stocked at nearly every home; the water temperature at multiple homes was above a safe level; bedrooms were dirty, had holes in walls and ceilings, and lacked sufficient lighting and storage; there were several instances of unsecured medications, chemicals, sharp tools, and broken glass; and there were findings of vermin, mold, and water damage at multiple homes. Because record evidence supports all of these findings, they were not against the manifest weight of the evidence. See *Porter*, 396 Ill. App. 3d at 723.

¶ 103   The secretary then determined that, by virtue of the overall condition of the premises, the premises were so sufficiently hazardous that their existence independently constituted imminent risk of harm to residents. As Gray and the surveyors explained, water temperatures over 130

degrees can cause second- or third-degree burns. Insufficient lighting created obvious tripping hazards. Understaffing, inadequate training, and outdated ISPs meant staff members were unaware of residents' specific dietary, mobility, medication, and programming needs—all safety concerns. Unsecured medicine cabinets, hardware drawers, chemicals, and broken glass all posed obvious safety threats. Dirty bathrooms, bedrooms, and common areas with holes in walls likewise posed obvious physical risks. Thus, it was reasonable for the secretary to conclude that these multiple safety threats, across all eight CILA homes, created an imminent risk to residents. See *Illinois Council of Police v. Illinois Labor Relations Board*, 404 Ill. App. 3d 589, 594-95 (2010) (determination not clearly erroneous if reasonable, consistent with law, and based on record evidence).

¶ 104   Finally, the secretary found that DSI had no identifiable DT program, was using the unregistered alternative DT site, failed to maintain updated ISPs, and congregated 24 participants at the 193rd Place CILA on November 22, 2016. Goodwin conceded the closure of the registered Hazel Crest site and DSI's use of the unregistered alternative site. Multiple residents informed surveyors about a lack of DT programming. All this—combined with the voluminous testimony regarding onsite and headquarters staff being unable to provide any details about community based programming—supported the finding that DSI had no identifiable DT program.

¶ 105   The Secretary's conclusion that these violations demonstrated an imminent risk to DT participants was reasonable because DSI could not ensure the safety of program participants, the unregistered DT site had failed three safety inspections, and conducting DT activities in CILA homes with safety hazards and chronic understaffing posed an obvious threat to DT participants.

Because the secretary's imminent-risk determination was reasonable, it was not clearly erroneous. See *Illinois Council of Police*, 404 Ill. App. 3d at 594-95.

¶ 106   DSI argues that none of the alleged safety violations withstood scrutiny at the hearing and were refuted by documentary evidence and Goodwin's testimony showing that DSI's homes and programs were safe. But—beyond DSI's failure to identify which alleged violations were refuted, what evidence refuted them, or how they were refuted—if the arguments challenging factual findings "are merely ones of conflicting testimony or credibility of witnesses, the determinations of the agency should be upheld," *Senno*, 2015 IL App (1st) 132837, ¶ 40. As discussed, plentiful evidence supported the secretary's findings.

¶ 107   DSI also asserts that the secretary's finding that DSI agreed to treat Southwest's violations as its own for purposes of considering repeat violations was against the manifest weight of the evidence because Goodwin testified to the contrary. Again, the existence of contrary evidence does not justify reversal of a finding. *Id*. Furthermore, the secretary did not actually rely on the agreement or repeat violations in her imminent risk determinations, so even if this finding were reversed, it would not demonstrate that the ultimate determinations were clearly erroneous. *Cf. Danigeles v. Illinois Department of Finance & Professional Regulation*, 2015 IL App (1st) 142622, ¶ 85 (improper admission of testimony did not justify reversal of agency decision where "ample" other evidence supported it).

¶ 108   DSI next claims that it was "targeted" by the Bureau after the Chicago Tribune's investigative reporting. Although not clear, DSI seems to argue that the Department's surveys and revocation were arbitrary and therefore clearly erroneous. However, Gray testified that the Chicago Tribune's articles had nothing to do with the surveys or the imminent risk declaration,

and initial surveys of provisional licensees and certificate holders are required within 12 months of issuance. See 59 Ill. Admin. Code 115.430(c) (eff. Aug. 13, 1999). The secretary was entitled to discredit Goodwin's testimony and implicitly credit Gray's testimony. See *Camelot, Inc. v. Burke Burns & Pinelli, Ltd.*, 2021 IL App (2d) 200208, ¶ 64 (trier of fact may make implicit credibility findings).

¶ 109   Additionally, DSI contends that Gray's imminent risk decision was arbitrary because (1) she based her decision on reports from a single surveyor, and (2) testified that she was not sure she had read all the additional monitoring reports and made her decision before receiving all the reports. Both contentions mischaracterize Gray's testimony and fail to demonstrate that the secretary's imminent risk determination was clearly erroneous. The first incident DSI refers to actually concerned an e-mail exchange between Gray and another Department employee in which Gray discussed potential paths to revoke DSI's DT certificate; Gray was not discussing her actual decision or its basis on a single surveyor's report. Contrary to DSI's contention, Gray testified extensively to her revocation decision's basis on the totality of the circumstances and information. Furthermore, the second incident DSI refers to is Gray's testimony that she made her imminent risk decision based on all of the additional monitoring reports she had at the time. Furthermore, DSI mischaracterizes Fenton's "pleasantly surprised" statement during his testimony. Fenton was not commenting on the condition of DSI's CILAs but, rather, simply stating that he was "pleasantly surprised" that DSI took him to sites undergoing renovation because agencies usually took him to their best locations. Moreover, Fenton observed the properties in June 2016, four months before the Bureau's surveys, which was why the secretary gave Fenton's testimony—and similar

testimony by other ISCs—little evidentiary weight, as was her prerogative. See *Abrahamson*, 153 Ill. 2d at 88.

¶ 110   Next, DSI asserts that many of the violations did not constitute an imminent risk because they were immediately correctable or corrected. On the contrary, the additional monitoring surveys showed that cleanliness, safety, understaffing, and other issues at five homes were not immediately fixed and precipitated Gray's imminent risk declaration. To the extent Goodwin testified otherwise, this court does not reweigh the evidence or substitute its judgment for that of the secretary. See *id*.

¶ 111   DSI then accuses the secretary of failing to address the facts that were inconsistent with the definitions of imminent risk. This argument lacks merit because DSI fails to address the findings of systemic administrative inadequacies or determination of imminent risk based on the totality of the circumstances. Beyond, again, forfeiting these arguments (see *Grant v. State*, 2018 IL App (4th) 170920, ¶ 19), such arguments do not demonstrate error on administrative review (see *Jimenez v. Department of Finance & Professional Regulation*, 2020 IL App (1st) 192248, ¶ 47 (rejecting challenge to agency decision for failure to consider all evidence because reviewing court does not reweigh evidence)).

¶ 112   DSI concludes by arguing that the secretary's decision is clearly erroneous because she based it on violations that were not cited in the November 28, 2016 revocation letter. Looking past DSI's failure to cite supporting authority, the revocation letter explicitly stated that the listed problems were examples of DSI's violations. The letter also referred to DSI's general "failure to comply with service requirements, consistent and repeated failures to correct deficiencies *** and maintain corrections across [the] CILA program, and failure to maintain full compliance with DT

program standards[.]" Most of the "new" violations DSI identifies in its brief—*i.e.*, improper medication procedures and missing staff certifications—fall within these categories. The record established that the secretary properly considered all the evidence relevant to whether the Department met its burden to show that revocation was appropriate.

¶ 113                                    F. Motion to Reconsider

¶ 114   Finally, DSI challenges the circuit court's denial of DSI's motion to reconsider, which was based on purported new evidence—a Department memorandum dated November 22, 2016—that DSI obtained postjudgment.

¶ 115   As an initial matter, the Department argues that if DSI's formerly consolidated administrative review case and civil rights case merged, then DSI's motion to reconsider and the circuit court's ruling on it have not been preserved for this court's review.

¶ 116   The resolution of DSI's administrative review case in the circuit court and that case's subsequent severance from DSI's civil rights action, which is still pending in the circuit court, raises an issue of the scope of our jurisdiction in this appeal to review DSI's claim that the circuit court erred in denying DSI's motion to reconsider based on newly discovered evidence. See *Heartland Bank & Trust v. Katz*, 2020 IL App (1st) 182259, ¶ 11 (we have a duty to examine our jurisdiction and dismiss an appeal if we find that jurisdiction is lacking). To address this issue, we set forth the following timeline.

¶ 117   In July 2019, the Department secretary issued a final decision adopting the ALJ's report and recommendation to affirm the Bureau's November 2016 revocation of DSI's CILA license and DT certificate. In August 2019, DSI filed a complaint for administrative review in case No. 19 CH 9305.

¶ 118   In October 2019, DSI filed a civil rights action in case No. 19 L 11907 against the Department and others seeking damages for violations of DSI's due process and equal protection rights under the law pursuant to section 1983 (42 U.S.C. § 1983), section 2 of the Illinois Constitution, and the Fourteenth Amendment of the United States Constitution based on the Department's revocation of DSI's license. In January 2020, DSI moved to transfer the civil rights case No. 19 L 11907 from the circuit court's law division to the chancery division for consolidation with the administrative review case No. 19 CH 9305, for convenience and efficiency because the two complaints had some of the same and similar legal and factual issues. On January 22, 2020, the circuit court in the civil rights case No. 19 L 11907 granted DSI's motion to transfer and consolidate.

¶ 119   On April 26, 2021, the circuit court affirmed the Department's final administrative decision in case No. 19 CH 9305. On May 25, 2021, DSI filed a motion to reconsider based on newly discovered evidence and a motion to sever the administrative review case No. 19 CH 9305 from the civil rights case No. 19 L 11907 to allow for the postjudgment motion and appeal to be decided without delay. On May 26, 2021, DSI filed the appeal in this matter (case No. 1-21-0607).

¶ 120   On August 4, 2021, the circuit court granted the motion to sever the civil rights case No. 19 L 11907 from the administrative review case No. 19 CH 9305.

¶ 121   On March 28, 2022, the circuit court denied DSI's motion to reconsider in the administrative review case No. 19 CH 9305.

¶ 122   The administrative review and civil rights actions were consolidated for efficiency and the convenience of the court and the parties involved. After consolidation, the parties' filings and the court's orders continued referring to the two cases separately, and the court's April 26, 2021 order

addressed only the administrative review action. Because the two cases were consolidated only for convenience and economy, they did not merge into a single suit. See *Trilisky v. City of Chicago*, 2019 IL App (1st) 182189, ¶¶ 21-22 (consolidation did not merge cases where court and parties continued to address actions separately); *Kassnel v. Village of Rosemont*, 135 Ill. App. 3d 361, 364 (1985) (same, where cases retained separate numbers and separate judgments were entered in each). Thus, an order disposing of all claims against all parties in one case would be final and appealable, and a party must timely file a postjudgment motion or appeal from that order to preserve appellate jurisdiction. See *Trilisky*, 2019 IL App (1st) 182189, ¶¶ 21-22. Accordingly, the April 26, 2021 order affirming the Department's decision was final and appealable. See *id.* ¶ 22.

¶ 123    Moreover, DSI's May 25, 2021 motion to reconsider was a timely postjudgment motion because it was filed within 30 days of the judgment on April 26, 2021. See 735 ILCS 5/2-1203 (2016). DSI's filing of a notice of appeal the following day, May 26, 2021, was premature because its postjudgment motion remained pending. See Ill. Sup. Ct. R. 303(a)(1), (2) (eff. July 1, 2017). But the premature notice of appeal became effective upon the circuit court's denial of the motion to reconsider on March 28, 2022. See Ill. Sup. Ct. R. 303(a)(2). This court thus has jurisdiction under Rule 301 from DSI's notice of appeal, and, because the motion to reconsider was a timely postjudgment motion, this court has jurisdiction to consider it as well. See *id.*

¶ 124    Regardless, on administrative review this court considers the agency's decision, not the circuit court's, so the circuit court's denial of the reconsideration motion is not at issue. See *Matlock v. Illinois Department of Employment Security*, 2019 IL App (1st) 180645, ¶ 29. In addition, neither the circuit court nor this court can consider new evidence that was not presented to the agency. *Id.* (citing 735 ILCS 5/3-110 (West 2016)).

¶ 125   At most, DSI could have argued a due process violation from the alleged failure to produce the memorandum, with the remedy being a new administrative hearing. See *id*. § 3–111(a)(7) (allowing circuit court to remand to take new evidence). This is so because, again, the circuit court does not review evidence in the first instance and new evidence cannot be introduced on administrative review. See *id*. § 3-110. Thus, DSI's request for outright reversal on these grounds is inappropriate.

¶ 126   Moreover, any potential production-based due process arguments are doubly forfeited because DSI did not raise them before the circuit court (*Basta*, 2022 IL App (2d) 210234, ¶ 94), or in its opening brief (*Life Energy*, 2021 IL App (2d) 200411, ¶ 115). Nor has DSI ever requested a remand for a new hearing. See *Powell v. Dean Foods Co.*, 2012 IL 111714, ¶ 41 ("court may not consider relief not requested in the trial court"); *cf. Hamilton v. Hastings*, 2014 IL App (4th) 131021, ¶¶ 30-31 (declining to address argument for directed verdict where postjudgment motion requested only new trial).

¶ 127   Nevertheless, had DSI requested it, remand would not be appropriate. Section 3-111(a)(7) of the Code of Civil Procedure (735 ILCS 5/3-111(a)(7) (West 2016)) requires three conditions to justify remand: (1) the evidence was discovered after termination of the administrative proceedings; (2) it could not have been discovered by the exercise of reasonable diligence during the proceedings; and (3) the evidence is material and not cumulative. Failure to meet any of the three requirements dooms a request for remand. See *Crabtree v. Illinois Department of Agriculture, Division of Agriculture Regulation*, 128 Ill. 2d 510, 517-18 (1989). To justify remand or to establish a due process violation, DSI would also have to show prejudice. See *Schachter v.*

*City of Chicago*, 2016 IL App (1st) 150442, ¶ 37 (remand); *All America Title Agency, LLC v. Department of Finance & Professional Regulation*, 2013 IL App (1st) 113400, ¶ 36 (due process).

¶ 128   The memorandum at issue here does not meet any of these requirements. During discovery, the parties agreed that the Department would produce e-mails without attachments and that DSI would request the specific attachments it wanted. Consistent with this agreement, the Department produced the November 22, 2016 e-mail. DSI did not request the attachment, and so the memorandum was never produced. DSI, therefore, had notice of the memorandum's existence and could have discovered it by exercising reasonable diligence. See, *e.g.*, *Crabtree*, 128 Ill. 2d at 517-18.

¶ 129   The memorandum, moreover, is either immaterial or cumulative. The portion of the memorandum DSI latches onto is a description of another Department unit's concern that not enough evidence existed to declare imminent risk on November 22, 2016. It is immaterial, therefore, to Gray and the Bureau's assessment in declaring imminent risk after November 23, 2016. The remainder of the memorandum is cumulative because it states Gray's and the Bureau's position that the conditions of DSI's programs likely justified an imminent risk declaration—which was presented extensively in testimonial and documentary evidence. Where the new evidence is immaterial and/or cumulative, remand for a new hearing is not appropriate. *Michno v. Cook County Sheriff's Office*, 2021 IL App (1st) 200933, ¶¶ 39-41 (immaterial); *Baker v. Illinois Department of Employment Security*, 2014 IL App (1st) 123669, ¶ 25 (cumulative).

¶ 130   Finally, DSI could not show any prejudice requiring a new administrative hearing. There is no prejudice where a party had notice of the "new" information prior to hearing, the information's potential exculpatory value is speculative, and/or other evidence was sufficient to

support the agency's decision. *Life Energy*, 2021 IL App (2d) 200411, ¶¶ 84-85; *Gonzalez v. Pollution Control Board*, 2011 IL App (1st) 093021, ¶ 43. The memorandum fits all these criteria, and so does not require a new hearing because it would not change the secretary's determination. See *Danigeles*, 2015 IL App (1st) 142622, ¶ 85 (no prejudice from improper admission of testimony where "ample" other evidence supported decision); *Lyon v. Department of Children & Family Services*, 335 Ill. App. 3d 376, 385 (2002) (party "cannot receive a windfall from a procedural violation that apparently caused him no actual harm").

¶ 131 DSI contends it never agreed to waive the Department's responsibility to produce exculpatory evidence under 89 Ill. Admin. Code 508.100(c) (eff. Dec. 31, 2003), and that the nondisclosure precluded it from relying on the memorandum during the hearing. DSI has never before cited this provision and may not do so for the first time before this court. Regardless, to the extent DSI is claiming the Department's purported noncompliance with this regulation violated its due process rights (an argument it does not articulate) it has not shown any prejudice justifying a new hearing because the memorandum is not exculpatory.

¶ 132                                   III. CONCLUSION

¶ 133 For the foregoing reasons, we affirm the judgment of the circuit court that affirmed the final administrative decision of the Department secretary.

¶ 134 Circuit court judgment affirmed.

¶ 135 Board decision affirmed.